## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **MARK BRADLEY BARNES,** | |
| *Plaintiff,* | |
| **v.** | **CASE NO 22-1028** |
| **PHILIPS NORTH AMERICA LLC; PHILIPS RS NORTH AMERICA LLC, AND KONINKLIJKE PHILIPS N.V.;** | |
| *Defendants* | |

---

## COMPLAINT

---

Plaintiff Mark Bradley Barnes ("Plaintiff"), a person of full age of majority and who is domiciled in Bossier Parish, State of Louisiana and who for his complaint against Defendants Philips North America LLC ("Philips NA"), Koninklijke Philips N.V. ("Royal Philips"), and Philips RS North America LLC ("Philips RS") (collectively, Royal Philips, Philips NA, and Philips RS are "Philips" or the "Defendants"), respectfully represents the following:

### INTRODUCTION

1.

On April 26, 2021, Philips disclosed in its Quarterly Report for Q1 2021 that it had determined there were possible risks related to the sound abatement foam used in certain Philips' sleep and respiratory care devices currently in use. Philips acknowledged that the risks included that the foam may degrade under certain circumstances, influenced by factors including

unapproved cleaning methods, such as ozone, and certain environmental conditions involving high humidity and temperature. The majority of the affected devices were in the first-generation Dream Station product family.

2.

On June 14, 2021, Philips issued a further statement about the possible health risks stemming from the deterioration of the PE-PUR foam in its CPAP, Bi-Level PAP, and mechanical ventilator devices, because Philips had determined that (a) the PE-PUR foam was at risk for degradation into particles that may enter the devices' pathway and be ingested or inhaled by users, and (b) the PE-PUR foam may off-gas certain chemicals during operation. Philips further disclosed in its Recall Notice that "these issues can result in serious injury which can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment."

3.

Philips disclosed that the absence of visible particles in the devices does not mean that PE-PUR foam breakdown has not already begun. Philips reported that lab analysis of the degraded foam reveals the presence of harmful chemicals, including: Toluene Diamine ("TDA"), Toluene Diisocyanate ("TDI"), and Diethylene Glycol ("DEG").

4.

Prior to issuing the Recall Notice, Philips received complaints regarding the presence of black debris/particles within the airpath circuit of its devices (extending from the device outlet, humidifier, tubing, and mask). Philips also received reports of headaches, upper airway irritation, cough, chest pressure and sinus infection from users of these devices.

5.

In its Recall Notice, Philips disclosed that the potential risks of particulate exposure to users of these devices include: irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic affects.  The potential risks of chemical exposure due to off-gassing of PE-PUR foam in these devices include: headache/dizziness, irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects.

6.

Philips recommended that patients using the recalled CPAP and Bi-Level PAP devices immediately discontinue using their devices and that patients using the recalled ventilators for life-sustaining therapy consult with their physicians regarding alternative ventilator options.

7.

In November of 2020, Plaintiff purchased a Philips' Dream Station Auto CPAP, which he used.  According to the correspondence received by Plaintiff from Philips on or about August 4, 2021, Plaintiff's CPAP device was subject to the Philips' recall ("Recalled Devices").

8.

Plaintiff used his Recalled Device regularly to treat a health condition since the date of purchase, until he received notice of the recall on or about August 4, 2021.

9.

As a result of the health risks associated with continued use of his device and the recall, Plaintiff's Recalled Device is now worthless.  Plaintiff must now incur substantial expenses to replace the device.

10.

In addition, Plaintiff experienced adverse health issues during his use of the Recalled Devices including respiratory and breathing issues and skin cancer on his face. Since being notified of the recall, Plaintiff has also experienced anxiety concerning the potential serious health risks he is facing from exposure to off-gassed or degraded PE-PUR foam in the recalled devices.

11.

Plaintiff seeks to recover damages based on, *inter alia*, Philips' defective construction or composition, defective design, inadequate warning, breach of express warning and redhibition in connection with its manufacture, marketing and sales of devices containing PE-PUR foam.

12.

Plaintiff is a citizen of the State of Louisiana.

13.

Defendant Royal Philips is a Dutch multinational corporation with its principal business located in Amsterdam, Netherlands. Royal Philips is the parent company of the Philips Group of healthcare technology businesses, including Connected Care businesses focusing on Sleep & Respiratory Care. Royal Philips holds directly or indirectly 100% of its subsidiaries Philips NA and Philips RS. Upon information and belief, Royal Philips controls Philips NA and Philips RS in the manufacturing, selling, distributing, and supplying of the recalled CPAP, Bi-Level PAP, and mechanical ventilator devices.

14.

Defendant Philip NA is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141. Philips NA is a wholly-owned subsidiary of Royal Philips.

15.

Defendant Philips RS is a Delaware corporation with its principal place of business located at 6501 Living Place, Pittsburgh, Pennsylvania 15206. Philips RS is a wholly-owned subsidiary of Royal Philips.  Philips RS was formerly operated under the business name Respironics, Inc. ("Respironics").  Royal Philips acquired Respironics in 2008.

## JURISDICTION AND VENUE

16.

The Court has personal jurisdiction over the Defendants because Defendants conduct substantial business in this District, and the events giving rise to Plaintiff's claims arise out of and relate to Defendants' contacts with this District.  Further, Defendants have transacted business, maintained substantial contacts, purposefully targeted consumers and medical professionals for sales of its devices and/or committed overt acts in furtherance of the unlawful acts alleged in this Complaint in this District, as well as throughout the United States. The unlawful acts of Defendants have been directed at, targeted, and have had the effect of causing injury to persons residing in, located in, or doing business in this District, as well as throughout the United States.

17.

Jurisdiction of this Court is further based on Diversity of Citizenship and an amount in controversy that exceeds the jurisdictional limit of $75,000.00 exclusive of interest and cost.

18.

Venue is proper in the Western District of Louisiana under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts and conduct charged herein occurred in this District.

## FACTUAL BACKGROUND

### 19.

Continuous Positive Airway Pressure ("CPAP") therapy is a common nonsurgical treatment primarily used to treat sleep apnea.  CPAP therapy typically involves the use of a hose and a nasal or facemask device that delivers constant and steady air pressure to an individual's throat to help individuals breathe.

### 20.

Sleep apnea is a common sleep disorder characterized by repeated interruptions in breathing throughout an individual's sleep cycle.  These interruptions, called "apneas," are caused when the soft tissue in an individual's airway collapses. The airway collapse prevents oxygen from reaching the individual's lungs which can cause a buildup of carbon dioxide.  If the individual's brain senses the buildup of carbon dioxide, it will briefly rouse the individual form sleep so that the individual's airway can reopen.  Often these interruptions are so brief that the individual will not remember.  Despite the brevity of the interruptions, the sleep cycle disruption caused by sleep apnea can dramatically impact a person's lifestyle, including negatively impacting energy, mental performance, and long-term health. CPAP therapy helps treat sleep apnea by preventing the person's airway from collapsing while breathing during sleep cycles, which can help prevent interruptions in breathing.

## SUBSTANTIVE ALLEGTIONS

### 21.

Philips developed, marketed, and sold a variety of CPAP and Bi-Level PAP respirator devices and mechanical ventilators under its "Sleep & Respiratory Care" segment of its business designed to assist individuals with a number of sleep, breathing, and respiratory conditions,

including obstructive sleep apnea, central sleep apnea, complex sleep apnea syndrome, and Chronic Obstructive Pulmonary Disease (COPD), as well as to assist those individuals requiring invasive and non-invasive ventilators for acute and sub-acute hospital environments. Philips' CPAP and Bi-Level PAP respirator devices and its mechanical ventilators typically cost several hundred, if not thousands of dollars.

**I.    Philips Sleep & Respiratory Care Devices Endangered Users**

22.

On April 26, 2021, in its Quarterly Report for Q1 2021, Philips disclosed for the first time, under a section entitled "Regulatory Update," that device user reports had led to a discovery that the type of PE-PUR Foam Philips used to minimize noise in several CPAP and Bi-Level PAP respirators and mechanical ventilators posed health risks to its users. Specifically, Philips disclosed that "the [PE-PUR] foam may degrade under certain circumstances, influenced by factors including use of unapproved cleaning methods, such as ozone, and certain environmental conditions involving high humidity and temperature."

23.

Seven weeks later, on June 14, 2021, Philips announced a recall on numerous models of CPAP and Bi-Level PAP devices, as well as a variety of its mechanical ventilators "to address identified potential health risks related to the polyester-based polyurethane (PE-PUR) sound abatement foam component in these devices." Specifically, Philips announced that it had determined that the "PE-PUR foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user, and the foam may off-gas certain chemicals." In total, Philips announced that "[b]tween 3 and 4 million" devices were targeted in the recall.

24.

According to Philips, the PE-PUR foam used in recalled devices puts users at risk of suffering from: "irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (e.g. kidneys and liver) and toxic carcinogenic affects."

25.

Philips reported to physicians that PE-PUR foam particles "may cause irritation and airway inflammation, and this may be particularly important for patients with underlying lung diseases or reduced cardiopulmonary reserve."

26.

Further, Philips reported that "based on lab testing and evaluations, it may be possible that these potential health risks could result in a wide range of potential patient impact, from transient potential injuries, symptoms and complications, as well as possibly serious injury which can be life-threatening or cause permanent impairment, or require medical intervention to preclude permanent impairment."

27.

Philips announced that it has received reports of specific complaints from users of recalled devices who suffered from "headache[s], upper airway irritation, cough, chest pressure and sinus infection."

**II. The Health Risks Associated with Use of the Recalled Devices Renders Them Worthless**

28.

As a result of the health risks associated with the use of the recalled devices, together with Defendants' concealment of these risks from the date they were first reported to Defendants or

discovered by Defendants, the recalled devices have been rendered completely worthless or, at the very least, have been substantially diminished in value.

29.

Recognizing this, Philips issued the following advice to patients using any of the recalled devices:

- "For patients using BiLevel Pap and CPAP devices: Discontinue use of affected units and consult with physicians to determine the benefits of continuing therapy and potential risks."

30.

As a result of the above, Plaintiff will have to undertake considerable expense replacing the recalled devices.

**III. Philips Unreasonably Delayed its Recall**

31.

At no time prior to its Regulatory Update on April 26, 2021, did Philips disclose that the recalled devices that the PE-PUR foam contained therein may off-gas or degrade upon use. Similarly, prior to the Update, Philips did not disclose any health risks associated with use of the recalled devices.

32.

Defendants have not disclosed when they first discovered or received reports from users of their Sleep & Respiratory Care devices "regarding the presence of black debris/particles within the airpath circuit (extending from the device outlet, humidifier, tubing, and mask)."

33.

At a minimum, as a result of user reports, Defendants were aware of the off-gassing and degradation of the PE-PUR foam used in the recalled devices at some point prior to the recall, yet continued to manufacture and sell the recalled devices with such awareness. During this period, Defendants unreasonably and unjustly profited from the manufacture and sale of the recalled devices and unreasonably put users of the recalled devices at risk of development of serious adverse health effects, including organ failure and cancer.

### IV. Plaintiff Mark Bradley Barnes

34.

Plaintiff is a resident of Benton, Louisiana which is located in Bossier Parish.

35.

Plaintiff purchased one of the recalled devices prior to June 14, 2021, a Philips Dream Station Auto CPAP (SN J29987375F008).

36.

The manual accompanying the recalled device did not contain any language or warnings of health risks associated with use of the device, including irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic effects. Had Defendants informed Plaintiff of these risks, he would not have purchased and used the recalled Device.

37.

Without knowing of the health risks associated with the use of the recalled devices, Plaintiff used the recalled device regularly to treat sleep apnea.

38.

As a result of the health risks associated with use of the recalled devices, Plaintiff recalled device is now worthless and Plaintiff will be forced to replace the device at considerable cost.

39.

Moreover, following the continued use of the recalled device Plaintiff suffered consistent shortness of breath with ambulation requiring the use of oxygen.

40.

Further, in May of 2021, Plaintiff noticed a spot had developed on his left cheek in the location of placement of the Recalled Device. Plaintiff received biopsy results on August 3, 2021 which identified the spot as "Basal Cell Carcinoma." Plaintiff's skin cancer was caused by the health risks associated with the recalled device.

## TOLLING AND ESTOPPEL

### I. Discovery Rule Tolling

41.

On or about August 4, 2021, Plaintiff, for the first time, received notice from Defendant that his Philips Dream Station Auto CPAP presented health risks and was subject to a recall. Prior to that date, Plaintiff had no way of knowing about Defendant's conduct with respect to the health risks associated with the use of the Recalled Devices.

42.

Plaintiff, through the exercise of reasonable care, could not have discovered the conduct by Philips alleged herein. Further, Plaintiff did not discover and did not know of the facts that would have caused a reasonable person to suspect that Philips was engaged in the conduct alleged herein.

43.

Further, Plaintiff had no reason to know or should have know that his health issues were related to his use of his Philips Dream Station Auto CPAP until he received notice of the recall on or about August 4, 2021.

44.

For these reasons, all applicable statutes of limitation have been tolled by the discovery rule with respect to claims asserted by Plaintiff.

**II. Fraudulent Concealment Tolling**

45.

By failing to provide immediate notice of the adverse health effects associated with continued use of the Recalled Devices, Philips concealed its conduct and the existence of the claims asserted herein from Plaintiff.

46.

Upon information and belief, Philips intended its acts to conceal the facts and claims from Plaintiff. Plaintiff was unaware of the facts alleged herein without any fault or lack of diligence on his part and could not have reasonably discovered Defendants' conduct. For this reason, any statute of limitations that otherwise may apply to the claims of Plaintiff should be tolled.

## CORPORATE/VICARIOUS LIABILITY

47.

At all times herein mentioned, each of the Defendants was the agent, servant, partner, aider and abettor, co-conspirator and/or joint venturer of each of the other Defendants herein and was at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and/or joint venture and rendered substantial assistance and

encouragement to the other Defendants, knowing that their collective conduct constituted a breach of duty owed to the Plaintiff.

48.

There exists and, at all times herein mentioned, there existed a unity of interest in ownership between certain Defendants and other certain Defendants such that any individuality and separateness between the certain Defendants has ceased and these Defendants are the alter ego of the other certain Defendants and exerted control over those Defendants. Adherence to the fiction of the separate existence of these certain Defendants as entities distinct from other certain Defendants will permit an abuse of the corporate privilege and would sanction a fraud and/or would promote injustice.

49.

At all times herein mentioned, Defendants, and each of them, were engaged in the business of, or were successors in interest to, entities engaged in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, prescribing and/or advertising for sale, and selling products for use by the Plaintiff. As such, each Defendant is individually, as well as jointly and severally, liable to Plaintiff for his damages.

50.

At all times herein mentioned, the officers and/or directors of the Defendants named herein participated in, authorized and/or directed the production and promotion of the aforementioned products when they knew, or with the exercise of reasonable care and diligence should have known, of the hazards and dangerous propensities of said products, and thereby actively participated in the tortious conduct that resulted in the injuries suffered by Plaintiff.

## FIRST CAUSE OF ACTION
## REDHIBITION UNDER LA. C.C. ART. 250

51.

Plaintiff incorporates the foregoing allegations as if fully set forth herein.

52.

The Recalled Devices contain a vice or defect which renders it useless or its use so inconvenient that buyers would not have purchased it.

53.

Philips sold and promoted the Recalled Devices, which Philips placed into the stream of commerce.  Under Louisiana law, the seller warrants the buyer against redhibitory defects, or vices, in the thing sold.  La. C.C. art. 2520.  The recalled devices, sold and promoted by Philips, possesses a redhibitory defect because it was not manufactured and marketed in accordance with industry standards and/or is unreasonably dangerous, as described above, which renders the subject product useless or so inconvenient that it must be presumed that a buyer would not have bought the subject product had he known of the defect.  Pursuant to La. C.C. art. 2520, Plaintiff is entitled to obtain a recission of the sale of the Recalled Devices.

54.

The Recalled Devices alternatively possesses a redhibitory defect because the Recalled Devices were not manufactured and marketed in accordance with industry standards and/or were unreasonably dangerous, as described above, which diminishes the value of the recalled devices so that it must be presumed that a buyer would still have bought it but for a lesser price.  In this instance, Plaintiff is entitled to a reduction of the purchase price of the Recalled Devices.

55.

Philips is liable as a bad faith seller for selling a defective product with knowledge of the defect, and thus, are liable to Plaintiff for the price of the Recalled Devices, with interest from the purchase date, as well as reasonable expenses occasioned by the sale of the Recalled Devices, and attorneys' fees. As the manufacturer of the Recalled Devices, under Louisiana law, Philips is deemed to know that the Recalled Devices possessed a redhibitory defect. La. C.C. art. 2545.

56.

As a result of the Recalled Devices redhibitory defects, Plaintiff has suffered actual damages in that the Recalled Devices he purchased is worth less than the price he would have paid and which he would not have purchased at all had he known of the attendant health risks associated with the use of the Recalled Devices and that caused him personal injuries, pain and suffering, loss of enjoyment of life, mental anguish and to incur medical and pharmaceutical bills which he would not have otherwise incurred.

57.

By reason of the foregoing, Plaintiff seeks actual damages, attorneys' fees, costs, and any other just and proper relief available thereunder for the Recalled Devices' redhibitory defects.

**SECOND CAUSE OF ACTION**
**CONSTRUCTION OR COMPOSITION DEFECT UNDER LA R.S. 9:2800.55**

58.

Plaintiff incorporates the foregoing allegations as if fully set forth herein.

59.

Plaintiff asserts he is entitled to relief and recovery under the LPLA for Philips' defective construction or composition.

60.

At all times material to this action, Philips was engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling the recalled devices, including the Recalled Devices.

61.

At all times material to this action, the Recalled Devices were expected to reach, and did reach, consumers in the State of Louisiana and throughout the United States, including Plaintiff herein without substantial change in the condition in which it was sold.

62.

At all times material to this action, the Recalled Devices were designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by Philips in a defective and unreasonably dangerous condition at the time it was placed in the stream of commerce in ways which include, but are not limited to, one or more of the following particulars:

a.  When placed in the stream of commerce, the Recalled Devices contained manufacturing defects which rendered the subject products unreasonably dangerous;

b.  The Recalled Devices' manufacturing defects occurred while the products were in the possession and existed before they left the control of Philips; and

c.  The Recalled Devices were not made in accordance with Philips specifications or performance standards.

63.

Philips knew or should have known of the defective nature of the Recalled Devices used by Plaintiff, including (among other things), that the PE-PUR foam used in the Recalled Devices' component parts were prone to flaking, chemicalization, disintegration, that it could enter the

user's airways while he slept, exposing him to increased and unnecessary risk of cancer, as well as other injuries.

64.

The Recalled Devices manufactured by Philips were defective in construction or composition in that, when it left the hands of Philips, it deviated in a material way from Philips' manufacturing performance standards and/or it differed from otherwise identical products manufactured to the same design formula. In particular, the product was not safe, had numerous and serious side effects and caused severe and permanent injuries. The product was unreasonably dangerous in construction or composition as provided by La. R.S. 9:2800.55.

65.

As a direct and proximate result of Philips' conduct, Plaintiff has suffered actual damages in that he purchased the Recalled Devices (a) that were worth less than the price he paid, (b) which he would not have purchased at all had he known of the health risks, including organ failure and cancer, associated with the use of the Recalled Devices, (c) which did not conform to the Philips' manufacturing performance standards and/or otherwise identical products' standards, and (d) that caused him personal injuries, pain and suffering, loss of enjoyment of life, mental anguish and to incur medical and pharmaceutical bills which he would not have otherwise incurred.

66.

By reason of the foregoing, Plaintiff has suffered damages as alleged herein.

**THIRD CAUSE OF ACTION**
**DESIGN DEFECT UNDER LA. R.S. 9:2800.56**

67.

Plaintiff incorporates the foregoing allegations as if fully set forth herein.

68.

Plaintiff asserts he is entitled to relief and recovery under the LPLA for Philips' defective design.

69.

The Recalled Devices are defective in design or formulation in that they are not reasonably fit, suitable, or safe for their intended purpose and/or their foreseeable risks exceed the benefits associated with their design and formulation. The subject products were unreasonably dangerous in design as provided by La. R.S. 9:2800.56.

70.

At all times material to this action, the Recalled Devices were expected to reach, and did reach, consumers in the State of Louisiana and throughout the United States, including Plaintiff, without substantial change in the condition in which it was sold.

71.

The Recalled Devices used by Plaintiff were not reasonably safe for their intended uses and were defective with respect to their design. The Recalled Devices' design defects included, but are not limited to:

a. The use of polyurethane PE-PUR sound abatement foam in the Recalled Devices and the immune reaction that results from such material, causing adverse reactions and injuries;

b. Failing to design the Recalled Devices so as to avoid an unreasonable and increased risk of harm of cancer and other injuries in users;

c. Including in the design of the Recalled Devices flawed polyurethane PE-PUR sound abatement foam that could break down, flake off and/or chemicalize and infiltrate the device's air

pathway while the user is sleeping, exposing the user to increased and unnecessary risk of cancer, as well as other injuries;

d.   Failing to use alternatively available sound abatement materials and/or foams in the Recalled Devices, such as plastic, silicone, or rubber, which would not break down, flake off and/or chemicalize and infiltrate the device's air pathway while the suer is sleeping;

e.   Otherwise negligently or carelessly designing, manufacturing, marketing, labeling, packaging and/or selling the Recalled Devices.

72.

At all times, the use of the Recalled Devices by Plaintiff was foreseeable and foreseen by Philips as it was used by Plaintiff in the manner intended by Philips.

73.

The Recalled Devices designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Philips were defective in design and/or formulation, in that, when they left the hands of the Philips, manufacturers, and/or suppliers, they were unreasonably dangerous, and they were more dangerous than an ordinary consumer would expect.

74.

At all times herein mentioned, the Recalled Devices were in a defective condition and unsafe, and Philips knew or had reason to know that said products were defective and unsafe, especially when used in the form and manner as provided by Philips.

75.

Philips, with this knowledge, voluntarily designed the Recalled Devices in a dangerous condition for use by the public, and in particular the Plaintiff.

76.

Philips had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

77.

Philips created products unreasonably dangerous for its normal, intended use.

78.

The Recalled Devices designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Philips, were manufactured defectively in that the Recalled Devices left the hands of Philips in a defective condition and was unreasonably dangerous to its intended users.

79.

The Recalled Devices designed, researched, manufactured, tested, advertised, promoted, marketed sold and distributed by Philips reached their intended users in the same defective and unreasonably dangerous condition in which they were manufactured.

80.

In addition, at the time the Recalled Devices left the control of Philips, there were practical and feasible alternative designs that would have prevented and/or significantly reduced the risk of Plaintiff's injuries without impairing the reasonably anticipated or intended function of the product.  These safer alternative designs were economically and technologically feasible, and would have prevented or significantly reduced the risk of Plaintiff's injuries without substantially impairing the Recalled Devices' utility.

81.

Plaintiff could not, by exercise of reasonable care, have discovered the Recalled Devices'

defects herein mentioned and perceived its danger.

82.

As a direct and proximate result of Philips' conduct, Plaintiff has suffered actual damages

in that he purchased the Recalled Devices (a) that were worth less than the price he paid, (b) which

he would not have purchased at all had he known of the health risks, including organ failure and

cancer, associated with the use of the Recalled Devices, (c) which were defective and unsafe and

(d) that caused him personal injuries, pain and suffering, loss of enjoyment of life, mental anguish

and to incur medical and pharmaceutical bills which he would not have otherwise incurred.

83.

By reason of the foregoing, Plaintiff has suffered damages as alleged herein.

**FOURTH CAUSE OF ACTION**
**INADEQUATE WARNING UNDER LA. R.S. 9:2800.57**

84.

Plaintiff incorporates the foregoing allegations as if fully set forth herein.

85.

In the alternative, Plaintiff asserts that he is entitled to relief and recovery under the LPLA

for Philips' inadequate warning.

86.

The Recalled Devices were defective and unreasonably dangerous when they left the

possession of Philips in that it contained warnings insufficient to alert consumers, including

Plaintiff herein, and his healthcare providers, of the dangerous risks and reactions associated with

the subject product, including but not limited to its propensity to cause permanent physical injuries

and side effects, notwithstanding Philips' knowledge of an increased risk of these injuries and side effects.  Thus, the Recalled Devices were unreasonably dangerous because an adequate warning was not provided pursuant to La R.S. 9:2800.57.

87.

The Recalled Devices manufactured and supplied by Philips was defective due to inadequate post-marketing warning or instruction because, after Philips was placed on reasonable notice from user reports and its lab testing that the PE-PUR foam in the Recalled Devices was unsafe, Philips failed to provide an adequate warning to consumers and/or their health care providers of the defects of the product, and/or alternatively failed to conform to federal and/or state requirements for labeling, warnings and instructions, or recall, while knowing that the product could cause serious injury.

88.

Plaintiff was prescribed and used the Recalled Devices for their intended purpose.

89.

Plaintiff could not have discovered any defect in the subject product through the exercise of reasonable care.

90.

As manufacturers, marketers, advertisers, distributors and sellers of the Recalled Devices, Philips had exclusive knowledge and notice of the fact that the warnings were not accurate, clear and/or were ambiguous.

91.

Philips' warnings and its omissions were material, and Plaintiff reasonably relied upon such representations and omissions in purchasing and using the Recalled Devices.

92.

Philips had a continuing duty to warn Plaintiff of the dangers associated with the subject product.

93.

Had Plaintiff received adequate warnings regarding the risks of the subject product, he would not have purchased it.

94.

As a direct and proximate result of Philips' conduct, Plaintiff suffered actual damages in that he purchased the Recalled Devices (a) that were worth less than the price he paid, (b) which labels, warnings, and packaging did not provide an adequate warning of the health risks, including organ failure and cancer, associated with the use of the Recalled Devices, (c) which he would not have purchased at all had she been warned of these health risks and (d) that caused him personal injuries, pain and suffering, loss of enjoyment of life, mental anguish and to incur medical and pharmaceutical bills which he would not have otherwise incurred.

95.

By reason of the foregoing, Plaintiff has suffered damages as alleged herein.

**FIFTH CAUSE OF ACTION**
**BREACH OF EXPRESS WARRANTY UNDER LA R.S. 9:2800.58**

96.

Plaintiff incorporates the foregoing allegations as if fully set forth herein.

97.

In the alternative, Plaintiff asserts he is entitled to relief and recovery under the LPLA for Philips' breach of express warranty.

98.

At all times material to this action, the Recalled Devices were expected to reach, and did reach, consumers in the State of Louisiana, including Plaintiff herein without substantial change in the condition in which it was sold.

99.

Philips expressly warranted, advertised, and represented to Plaintiff that the Recalled Devices were safe and appropriate for human use.

100.

Philips made these express warranties regarding the Recalled Devices' quality and fitness for use in writing through its website, advertisements, and marketing materials, and on the Recalled Devices' packaging and labels. These express warranties became part of the basis of the bargain that Plaintiff entered into upon purchasing the Recalled Devices.

101.

Philips' advertisements, warranties, representations, and omissions regarding health risks associated with the Recalled Devices, were made in connection with the sale of the Recalled Devices to Plaintiff.  Plaintiff relied on Philips' advertisements, warranties, representations, and omissions regarding the Recalled Devices in deciding whether to purchase and use Philips' Recalled Devices.

102.

Philips' Recalled Devices do not conform to Philips' advertisements, warranties, representations, and omissions in that they are not safe, healthy, and appropriate for human use, and pose risks of serious injury and disease, including organ failure and cancer.

103.

Philips therefore breached its express warranties under La R.S. 9:2800.58 by placing the Recalled Devices into the stream of commerce and selling them to consumers, when their use posed health risks, had dangerous effects and were unsafe, rendering these products unfit for their intended use and purpose, and unsafe and unsuitable for consumer use as marketed by Philips. These associated health effects substantially impair the use, value, safety of the Recalled Devices, and render them worthless.

104.

Philips was aware, or should have been aware, of the toxic or dangerous health effects of the use of the Recalled Devices, but nowhere on the package labeling or package inserts or on Philips' websites or other marketing materials did Philips warn Plaintiff that he was at risk of developing adverse health effects as a result of the dangerous PE-PUR foam used in the Recalled Devices.

105.

Instead, Philips concealed the dangerous health effects of the PE-PUR foam used in the Recalled Devices and deceptively represented that these products were safe, healthy, and appropriate for use, that it was of merchantable quality, that it did not produce any dangerous side effects in excess of those risks associated with other forms of treatment for sleep apnea, that the side effects it did produce were accurately reflected in the warnings and that it was adequately

tested and fit for its intended use. Philips thus utterly failed to ensure that the material representations they were making to consumers were true.

106.

The adverse health effects associated with use of the Recalled Devices existed when they left Philips' possession or control and were sold to Plaintiff. The dangers associated with use of the Recalled Devices were undiscoverable by Plaintiff at the time of purchase of the Recalled Devices.

107.

As manufacturers, marketers, advertisers, distributors and sellers of the Recalled Devices, Philips had exclusive knowledge and notice of the fact that the Recalled Devices did not conform to the affirmations of fact and promises.

108.

In addition, or in the alternative, to the formation of an express contract, Philips made each of the above-described representations and omissions to induce Plaintiff to rely on such representations and omissions.

109.

Philips' affirmations of fact and promises and its omissions were material, and Plaintiff reasonably relied upon such representations and omissions in purchasing and using the Recalled Devices.

110.

All conditions precedent to Philips' liability for its breach of express warranty have been performed by Plaintiff.

111.

Philips was placed on reasonable notice from user reports and its lab testing that the PE-PUR foam in the Recalled Devices was unsafe. Philips had ample opportunity either to stop using the PE-PUR foam or to replace the PE-PUR foam in the Recalled Devices to make them safe and healthy for use by Plaintiff, but failed to do so promptly.

112.

As direct and proximate result of Philips' breaches of express warranty, Plaintiff has been damaged because he did not receive the products as specifically warranted by Philips. Plaintiff did not receive the benefit of the bargain and suffered damages at the point of sale stemming from his overpayment for the Recalled Devices.

113.

By reason of the foregoing, Plaintiff seeks actual damages and any other just and proper relief available thereunder for Philips' failure to deliver goods conforming to their express warranties and resulting breach.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment against Philips as to each and every count, including:

A. A judgment in favor of Plaintiff and against defendants *in solido* declaring that Philips' actions constitute: (i) a redhibitory defect; (ii) construction or composition defect; (iii) design defect; (iv) inadequate warning; and (v) breach of express warranty, and that Philips is liable to Plaintiff, as described herein, for damages arising therefrom;

B. A judgment awarding Plaintiff all appropriate damages, including but not limited to damages for past and future pain and suffering, past and future loss of enjoyment of life,

past and future mental anguish, past and future hospital, medical, treatment and incidental expenses in an amount reasonable in the premises as to be determined at trial;

C.  A judgment awarding Plaintiff legal interest thereon from the date of judicial demand until paid, as permitted by law;

D.  For return of the price of the product with interests from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale, for medical costs associated with the recall and loss of use of the CPAP, for costs incurred for the preservation of the product and also for all damages allowed by law and for reasonable attorney fees.

E.  A judgment awarding Plaintiff costs and fees, including attorneys' fees, as permitted by law; and

F.  Grant such other legal, equitable or further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

Respectfully Submitted:


 *s/Corey J. Hebert*
Steve C. Thompson, Bar Roll No. 14469
James d'Entremont, Bar Roll No. 25635
Stephanie E. Robin, Bar Roll No. 33340
Corey J. Hebert, Bar Roll No. 31773
THOMPSON, d'ENTREMONT,
ROBIN & HEBERT, LLC
2161 Quail Run Drive, Suite A
Baton Rouge, Louisiana 70808
Telephone:    (225) 766-5001
*Counsel for Plaintiff*
corey@thompsonlawbr.com